**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

**ROBERT WILSON**                                                                    **PLAINTIFF**

**v.**                                       **Case No. 4:11-cv-00855-KGB**

**ARKANSAS STATE HIGHWAY and
TRANSPORTATION DEPARTMENT, et al.**                          **DEFENDANTS**

<u>**OPINION AND ORDER**</u>

Plaintiff Robert Wilson alleges claims of race discrimination and retaliation for having opposed unlawful discriminatory practices against defendants, the Arkansas State Highway and Transportation Department ("HTD"); Scott Bennett, individually and officially as the Director of the Arkansas State Highway and Transportation Department; the Arkansas State Highway Commission; and R. Madison Murphy, John Ed Regenold, John Burkhalter, Tom Schueck, and Dick Trammel, individually and officially as members of the Arkansas State Highway Commission ("Commission"). Mr. Wilson brings his claims pursuant to 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Fourteenth Amendment to the United States Constitution, and 42 U.S.C. § 1983. He also asserts a claim for declaratory judgment pursuant to 28 U.S.C. § 2201 and a supplemental state law claim for breach of contract. Before the Court is defendants' motion for summary judgment (Dkt. No. 25), to which Mr. Wilson has responded (Dkt. No. 35). Defendants have replied to Mr. Wilson's response (Dkt. No. 42).

For the following reasons, the Court grants defendants' motion for summary judgment (Dkt. No. 25) over Mr. Wilson's claims of race discrimination and retaliation. The Court dismisses without prejudice Mr. Wilson's supplemental state law claim for breach of contract.

I.      **Factual Background**

Mr. Wilson received his license to practice law in the state of Arkansas in 1977. HTD hired Mr. Wilson in its Legal Division on July 1, 1977, and appointed Mr. Wilson Chief Legal Counsel in 1988. As Chief Legal Counsel, Mr. Wilson supervised a staff of 20 to 25 employees. Mr. Wilson's job description provided that he was responsible for the "administration and advisement of legal procedures to the Division, Commissioners, and all others needs [sic] of management with the Department to assure effective compliance with Department policy, procedure, and with federal and state laws, in the overall operations of the Department" (Dkt. No. 36, ¶ 4).

Defendants state that "[a]ccording to Plaintiff Wilson he was the Chief Counsel for the Arkansas Highway Commission" (Dkt. No. 36, ¶ 5). Mr. Wilson denies this. Mr. Wilson states that his role was to give legal advice to the Commission, as well as HTD, but that there were times when he and his department were ignored. Mr. Wilson contends that people would bypass the Legal Division and that, "[a]lthough [he] theoretically was responsible for the legal matters of HTD, there were a number of people who worked around the legal department" (*Id.*).

Mr. Wilson contends that there were many documents that should have gone through the Legal Division for an opinion but did not. He also maintains that there were instances where the engineers pretended to be lawyers by going to commission meetings and giving legal opinions. Mr. Wilson states that, although the Equal Employment Opportunity ("EEO") Division had been transferred to the Legal Division, there were instances when Ralph Hall, the Assistant to the Director, and Crystal Woods, the Division Head of Human Resources, interfered with the decisions being made by the Legal Division. Mr. Wilson contends that Mr. Hall and Ms. Woods

changed the recommendations of the Legal Division about certain EEO matters involving complaints made by African Americans.

Defendants also state that "according to Plaintiff Wilson, if the Commission received erroneous legal advice it was '[his] neck on the line'" (*Id.*, ¶ 6). Mr. Wilson denies this, contending that HTD ignored his advice on various legal issues. Mr. Wilson states that former Director of HTD Dan Flowers criticized Mr. Wilson when he advised that a number of cases should be taken to trial or when he disagreed on the settlement amount for a case. Mr. Wilson states that he recommended that HTD settle race discrimination claims filed by two African American employees, "much to the chagrin of the administration, particularly Ralph Hall" (*Id.*).

Sometime during the 1990's, Mr. Wilson considered three different models of allowing employees of the Legal Division to take time off and eventually settled on a plan that allowed employees to take every third Friday off with pay. Mr. Wilson states that he was advised by Director Flowers and Jane Wilson, the then Division Head for Human Services at HTD, to "stop counting minutes" of the employee lawyers who worked under Mr. Wilson (Dkt. No. 36, ¶ 7). Some of these employees complained that Mr. Wilson was too harsh on them about coming in a few minutes late for work. Mr. Wilson states that Director Flowers and Ms. Wilson met with Mr. Wilson and advised him to come up with a plan to allow his employees to take time off. Following this meeting, Mr. Wilson states that he implemented a plan to allow his employees to take off half a day, every other Friday. Mr. Wilson divided his employees into three groups. Mr. Wilson contends that "[t]his plan was given the blessing of Dan Flowers and Ms. Wilson" (*Id.*). Mr. Wilson states that once he implemented the plan, he noticed that employee morale improved and productivity picked up.

Defendants assert that, since at least as early as 1993, in addition to the time off allowed on the rotating Friday afternoons, employees of the Legal Division had been allowed to take up to two hours off with pay to go to doctor appointments or to run personal errands without designating the time as leave time.  Mr. Wilson denies this, stating that although employees in the Legal Division were allowed to take time off for up to two hours to take care of personal errands, the employees typically would wait until their third Friday afternoon to take off and to take care of personal errands (*Id.*, ¶ 8).  Mr. Wilson also states that he did not implement this two hour window but that his predecessor had implemented it.

Sometime in June or July 2010, Larry Dickerson, HTD's Chief Financial Officer and Division Head of Fiscal Services, reported to Mr. Hall specific information that he had discovered regarding the time-keeping practices of the Legal Division.  Defendants state that Mr. Dickerson began researching the Legal Division's leave practices and was aware of the "rumors" that the Legal Division allowed employees to take time off in a fashion not authorized by HTD's policies.  Mr. Wilson denies this (Dkt. No. 36, ¶ 10).  Mr. Wilson states that the leave practices he implemented were known throughout HTD and that several management officials knew about his leave practices.  Mr. Wilson contends that Director Scott Bennett was aware of the leave practices as early as 2000.  Prior to becoming the Acting Director and eventual Director of HTD after the retirement of Director Flowers, Director Bennett served HTD as the Assistant Chief Engineer Planning (Dkt. No. 25-10, ¶¶ 3-5).  Director Bennett has worked for HTD since 1989.

Defendants state that Mr. Dickerson made inquiries of other support staff of HTD regarding Mr. Wilson's legal assistant Kimberly Jewell.  Defendants assert that Mr. Dickerson made inquiries about the days Ms. Jewell was absent and began comparing her time records with the days she was off.  Mr. Dickerson observed a pattern that Ms. Jewell was off every third

Friday and noted that her time records indicated she was at work on the afternoons in which she was off.  Mr. Wilson denies this, stating that he instructed Ms. Jewell to record the leave as "administrative leave" (Dkt. No. 36, ¶ 11).  Mr. Wilson asserts that "[t]he evidence revealed that a Caucasian employee by the name of Ms. Woods, who is the Division Head for Human Resources, allowed employees to take time off that was unearned, based on a trivia game, if they corrected the correct answer [sic]" (*Id.*).  Mr. Wilson alleges that defendants defended Ms. Woods's practice by contending that Ms. Woods coded the unearned leave as "admin leave" (*Id.*).

Mr. Wilson states that defendants stopped this practice once he was terminated.  He also claims that defendants "take[] the position that although the leave may be unearned, as long as the leave is recorded as 'administrative leave,' this somehow makes it proper to allow an employee to take off, with pay, despite not having earned the leave" (Dkt. No. 36, ¶ 11).  Mr. Wilson contends that Judy Robertson, the Chief Auditor of HTD, initially took the position that if the leave is coded as "administrative leave," this would somehow make unearned leave permissible from a management standpoint, but that Ms. Robertson changed her position by later stating that no matter how it is coded, if the leave is not earned, and the employee is granted leave with pay, it is improper (*Id.*).

Defendants contend that Mr. Dickerson made Mr. Hall, Ms. Woods, and Director Flowers aware of his findings.  Mr. Wilson disputes this, claiming that Director Flowers was well aware of the fact that Mr. Wilson allowed his employees to take time off and that Frank Vozel, the Chief Engineer, Deputy Director, and second-in-command at HTD, also was aware of this practice long before 2010 (*Id.*, ¶ 12).  Mr. Wilson states that most of the employees who worked in the administrative offices of HTD were aware of the practice and that defendants'

response to Mr. Wilson's interrogatories and requests for production of documents indicated that Mr. Hall was one of several management officials who knew about Mr. Wilson's leave practice as early as 2007.

Defendants also assert that sometime during August 2010, Mr. Dickerson and Mr. Hall made Ms. Robertson aware of their findings.  Mr. Wilson disputes this, stating that Mr. Hall called the "Fraud Hotline" and made a report to Ms. Robertson that Mr. Wilson was allowing his employees to take a half day off every other Friday.   Director Flowers requested that Ms. Robertson review the compensatory time practices throughout the Legal Division and in other divisions of HTD.  On or about November 10, 2010, Ms. Robertson completed and presented her review of the compensatory time practices of the Legal Division to Director Flowers and Mr. Vozel.

Defendants state that Ms. Robertson's review of timesheets in the Legal Division revealed that the Friday half-day off given to the employees was reported on timesheets as time worked.  Defendants also state that HTD Form 419-138 timesheets read, "I hereby certify that the total worked for the date is true and correct, and a knowledge [sic] that providing false information may be grounds for immediate dismissal" (Dkt. No. 36, ¶ 15).  Defendants provide Ms. Robertson's internal audit report as an exhibit.  This report states that "Internal Audit was informed that the Certification Statement was deleted from AHTD Form 10-138 at Chief Counsel Robert Wilson's direction at the time when support personnel were classified as non exempt and began completing timesheets in June of 2007" (Dkt. No. 25-6, at 3).   Ms. Robertson's report also states that certain timesheets "had the Employee Certification Statement covered with white out" (*Id.*).  Defendants also attach the results of the Williams & Anderson investigation, which states that Kimberly Jewell, an Office Administrative Assistant in the Legal

Division, informed the investigation that Mr. Wilson "directed Ms. Jewell to delete the certification statement from the time sheets" and that certain certification statements "had been 'whited out'" (Dkt. No. 25-9, at 11). Williams & Anderson's report also included a May 23, 2006, email from Ms. Jewell to certain employees in the Legal Division notifying these employees of Mr. Wilson's directive to delete the certification statement (*Id.*, at 11, 108).

Mr. Wilson disputes these contentions (Dkt. No. 36, ¶15). Mr. Wilson states that Ms. Robertson has been the Chief Auditor of HTD since November 30, 2009, and that she started her work at HTD in 1995. Mr. Wilson contends that the Audit Division conducts an audit of all divisions, including the Legal Division, at least once every two years. When conducting audits, the Audit Division looks at Code of Ethics Policy Reaffirmation, expenditures, payroll, minor fixed assets, and major fixed assets. The Audit Division also looks at timesheets and time records.

Mr. Wilson states that the last two audits of the Legal Division were conducted in 2008 and 2009 and that audit reports indicate that the Audit Division reviewed timesheets from August 2008 until August 2009. Mr. Wilson contends that, in conducting the audits and in looking at the timesheets, the Audit Division makes sure that the timesheets are filled out in compliance with the policies and procedures of HTD. The Audit Division also checks to ensure that the timesheets are signed by the employee and that the timesheets contain a statement by the employee that the information contained therein is true and accurate. Ms. Robertson testified that she is familiar with the fact that HTD's timesheets should have a verification on them. The Audit Reports of the Legal Division for 2008 and 2009 indicated that there were "no reportable findings" (Dkt. Nos. 36, ¶ 15; 36-2, at 24). Ms. Robertson testified in a deposition that the 2008 and 2009 audits included only "verbal findings," which she affirmed were only "minor things

that need to be taken care of" (Dkt. No. 36-2, at 26).  Ms. Robertson also testified that there were

no findings and recommendations included in the 2008 and 2009 audit reports and that the leave

activity was properly recorded and approved (*Id.* at 30).

Mr. Wilson states that his plan of allowing his employees to take time off every third

Friday was completed at the direction of Director Flowers and Ms. Wilson as early as 1992 or

1993.  Mr. Wilson states that, despite the fact that this policy had been in place that early and

despite the fact that the Audit Division conducts audits at least once every two years, there was

never an audit report that found certifications had been removed from timesheets or time records.

Mr. Wilson states that he neither directed that the certifications be removed from the timesheets

nor directed that the certifications be whited out.  Mr. Wilson contends that he directed that the

time off be coded as "admin leave" (Dkt. No. 36, ¶ 15).

Defendants state that, although Director Flowers, Mr. Hall, and Ms. Woods had varying

degrees of knowledge of the Legal Division's irregular leave practices, none of these individuals

had knowledge that the time off was being recorded as time worked.  Defendants also assert that

none of them had knowledge that the certification statement had been deleted from timesheets.

Mr. Wilson denies this, stating that Director Flowers was the one who directed him to develop a

plan to allow the legal staff time off and that Director Flowers testified that what Mr. Wilson was

doing was consistent with what he had been instructed to do in the early 1990s (*Id.*, ¶ 16; Dkt.

No. 36-2, at 60-61).

On or about April 9, 2011, HTD engaged the law firm of Williams & Anderson, PLC to

conduct an independent review of the investigation of HTD's internal Audit Division regarding

certain leave and timekeeper practices of HTD's Legal Division.  Defendants state that the

Commission requested, directly of Mr. Wilson and also through Mr. Wilson's counsel, that Mr.

Wilson interview with and provide information to attorneys from William & Anderson who were conducting the investigation. Defendants contend that Mr. Wilson agreed to speak with those attorneys on several occasions only to renege on his commitment and refuse to talk to them. Mr. Wilson disputes this, claiming that he agreed to meet with Phil Kaplan, an attorney with Williams & Anderson, but that during the meeting, Mr. Kaplan became belligerent, accusatory, and abusive (Dkt. No. 36, ¶18). Mr. Wilson alleges that he asked Mr. Kaplan if the investigation involved something that could cause Mr. Wilson to go to jail and that Mr. Kaplan responded "yes" (*Id.*). Mr. Wilson also states that during that meeting he requested his *Garrity* Warnings, but that Mr. Kaplan was not familiar with *Garrity* Warnings. Mr. Wilson states that at that point he decided to employ legal counsel.

On September 9, 2011, the Commission and HTD were summoned to appear before the Legislative Joint Auditing Committee at the Arkansas General Assembly. Defendants state that Commission Chairman and defendant Madison Murphy directed Mr. Wilson to meet with Commissioner Murphy and Director Bennett on the afternoon of September 7, 2011, at the HTD offices in order to prepare for testimony before the Joint Legislative Auditing Committee on September 9, 2011. Mr. Wilson denies that he was ever "directed" to meet with Commissioner Murphy and Director Bennett. Mr. Wilson states that "there was no need to meet with Mr. Murphy or Mr. Bennett, because they would not have listened to Mr. Wilson's advice anyway" (*Id.* at ¶ 19). Mr. Wilson testified before the Legislative Joint Auditing Committee. Defendants state that Mr. Wilson left the HTD offices without meeting with Commissioner Murphy and Director Bennett and that Mr. Wilson explained to Commissioner Murphy that he forgot about the meeting.

Defendants contend that Mr. Wilson failed to cooperate with the Commission and the HTD Director in preparation for the September 9, 2011, meeting before the Legislative Joint Auditing Committee at the Arkansas State Legislature.  Mr. Wilson disputes this, stating that he cooperated with the investigation (Dkt. No. 36, ¶ 21).  Mr. Wilson asserts that during the internal audit conducted by Ms. Robertson's team, he met with and spoke to the auditors.  Mr. Wilson states that, in response to the internal audit conducted during 2010, he wrote a memorandum to Director Flowers, explaining his position in reference to the internal audit.  Mr. Wilson states that he was interviewed by members of the internal audit team and that he gave his response to the internal audit report.  Mr. Wilson also claims that he tried to explain his position before the Legislative Joint Auditing Committee, "which was a political lynching for the plaintiff" (*Id.*). Mr. Wilson contends that there was really nothing else for him to tell Mr. Kaplan, especially after Mr. Wilson was advised that he could go to jail.  Mr. Wilson also states that the Legislative Joint Audit Report indicated that the information was being turned over to the prosecuting attorney for possible charges to be filed against him.

Defendants contend that, during the September 9, 2011, Legislative Joint Auditing Committee meeting, Mr. Wilson agreed to speak with lawyers from Williams & Anderson for that firm's investigation but later that day, during an executive session of the Commission, Mr. Wilson again refused to meet with investigators from Williams & Anderson.  Mr. Wilson disputes this, claiming that, since he was not provided his *Garrity* Warnings, he stopped talking (*Id.*, ¶ 22).

Defendants state that the report from Williams & Anderson confirmed many of the allegations of the Legislative Joint Auditing Committee and contained statements by employees within the Legal Division alleging that Mr. Wilson had authorized and/or personally directed the

falsification of time records of Legal Division employees.  Mr. Wilson states that there was no evidence that he directed anyone to falsify any documents and that he was instructed by Mr. Flowers and Ms. Wilson to implement the plan allowing Legal Division employees to take time off.

Defendants also assert that the Commission voted to place Mr. Wilson on administrative leave with pay on September 9, 2011, due to his failure to cooperate in preparation for the Legislative Joint Auditing Committee meeting and for his continued refusal to cooperate with the investigation into the time keeping practices in the Legal Division by refusing to speak with the investigators from Williams & Anderson.  Mr. Wilson disputes this, claiming that he was placed on administrative leave and ultimately terminated due to his race and due to having opposed discriminatory treatment.  Mr. Wilson states that he was the only African American Division head within the HTD, besides Emmanual Banks.

Mr. Wilson states that the evidence reveals that there are Caucasian division heads who also allowed their employees to take time off that had not been earned.  Mr. Wilson claims that Ms. Woods, who has been the Division Head of Human Resources since 2004, played a trivia game with her employees and if they answered a question right, employees were rewarded with two to four hours off of work.  Mr. Wilson states that Ms. Woods is responsible for the personnel manual; the reviewing of hiring, firing, and demotion decisions; and has approximately 30 employees on her staff.  Ms. Woods and the Assistant Head of Human Resources, Pam Hickman, are Caucasian.  Ms. Woods testified in her deposition that on the day before some holidays she allowed employees to take time off for guessing answers to trivia questions and that this practice began under her predecessor, Melba Shepard, who left in 2000 (Dkt. No. 36-3, at 19-20).  After Ms. Shepard left, Calvin Gibson was the division head for a few months before Ms. Woods was

in charge of the Human Resources Division.  Ms. Woods was not given the title of "division head" until 2004.

Mr. Wilson states that Ms. Woods said she also allowed a few employees to leave early the day before a holiday, which was not based on a game, and that a "few employees" could mean as many as 12 employees leaving early (Dkt. No. 36, ¶ 24).  Ms. Woods stated that when she "became aware of what all was going on and how concerned the auditors were," she had "a conversation and [she] said that [her division] won't be playing the game anymore" (Dkt. No. 36-3, at 21).  Ms. Woods stated that she did not know if an auditor or if Mr. Hall expressed concern over her practices.  Mr. Wilson states that Ms. Woods discussed her leave practices with Mr. Hall during the summer of 2010, when the internal audit about Mr. Wilson's practices was released (Dkt. No. 36, ¶ 24).  Mr. Wilson states that, although Mr. Hall informed Ms. Robertson about Mr. Wilson's practice of allowing employees to take time off that had not been earned, Mr. Hall did not tell Ms. Robertson about Ms. Woods's practices (*Id*).  In her deposition, Ms. Robertson stated that she could not remember when she first learned about Ms. Woods's practices but that she did not conduct any type of investigation about Ms. Woods's leave practices (Dkt. No. 36-3, at 40).

Mr. Wilson states that the practice of allowing employees to take time off that was not earned was widespread throughout HTD.  Mr. Wilson supports his claims with the deposition of Ted English, a Caucasian male who has been an employee at HTD for 21 years.  Mr. English currently serves as the Administrative Officer III, which is the assistant Section Head for the Traffic and Safety Section of HTD.  Mr. English testified in his deposition that he was aware of other division heads or other divisions that allowed employees to take time off (Dkt. No. 36-3, at 27).  Mr. English stated that the division in which he currently works and the Human Resources

Division, for which he had previously worked, had a practice of allowing its employees to take a half day off prior to each holiday (*Id.* at 27-28). Mr. English testified that Ms. Woods served as the division head for part of the time that he worked in the Human Resources Division.

Mr. English also said that "the section head, your boss would just come in and say why don't you just go on home, you know, take the rest of the day off. They'd usually make sure somebody was there to answer the phone . . ." (*Id.* at 28). Mr. Wilson states that Jon Waldrip was the Section Head for the Traffic Safety Division, that Mike Selig was the Assistant Division Head, and that Alan Meadors served as the Division Head. Mr. Waldrip, Mr. Selig, and Mr. Meadors are all Caucasian males. Mr. English stated that employees were typically given from two hours up to half a day off and that the leave was "unearned time" (Dkt. No. 36-3, at 31). Mr. English stated that he was "shocked" that Mr. Wilson was terminated and that, after Mr. Wilson was terminated, the practice of allowing employees to take time off ceased in his division (*Id.* at 26, 35). When asked if he knew why the practice stopped, Mr. Woods said, "Nobody told me why but I could connect the dots. . . . It was because somebody got in trouble for it and so we can't do it no more [sic]" (*Id.* at 35).

Mr. English also testified that Mr. Waldrip and Mr. Meadors allowed employees in the Planning and Research Division to turn in two separate time sheets, with one time sheet as the official time sheet turned into the payroll and the other time sheet as the unofficial time sheet turned into the division and section heads (Dkt. No. 36-3, at 38). Mr. English stated that the unofficial time sheet contained the hours that the employee actually worked, while the official time sheet contained the hours that the employee should have worked. For example, Mr. English stated that the employees were only supposed to take a 30-minute lunch break but that many took 45-minute to an hour lunch breaks, with the unofficial time sheet reflecting the longer breaks and

the official time sheet reflecting the shorter, 30-minute lunch breaks.  Mr. English stated that, after Mr. Wilson was terminated, he spoke with Mr. Meadors about the practice with the two timesheets and that Mr. Meadors said that he would continue with the practice.  Mr. English stated that he believed the practice of turning in two time sheets violated the policies and procedures of HTD and the Anti-Fraud policy of HTD.

Mr. Wilson was placed on administrative leave without pay on October 21, 2011. Defendants state that, on December 15, 2011, Mr. Bennett recommended the termination of Mr. Wilson because of the continued refusal to cooperate in the investigation, the seriousness of the allegations and proof of wrongdoing against Mr. Wilson that was contained in the Williams & Anderson report, and the continuing lack of confidence by the Director and the Commission in Mr. Wilson's ability to perform the duties as Chief Counsel of HTD.  Mr. Wilson disputes that he was terminated for these reasons. Defendants claim that the Williams & Anderson report "appeared to confirm the Department's Internal Audit Division's report that Plaintiff Wilson directed or authorized the deletion of the Certification Statements from the Legal Division employee's timesheets certifying that their timesheets were correct and accurate" and that the Legal Division employees were allowed to code the paid time off as if the employees were working (Dkt. No. 36, ¶ 27).  Mr. Wilson disputes these statements about the Williams & Anderson report, stating that the audits never reflected that certifications had been removed from timesheets (Dkt. No. 36, ¶ 27).  Mr. Wilson reiterates that the Legal Division was audited at least one or two times per year by the Internal Audit Division, that he never directed that the certifications be removed from the timesheets or whited out, and that he directed that the time off should be coded as "admin leave" (*Id.*).

In support of his retaliation claims, Mr. Wilson states that, "[a]lthough the EEO Section had been placed under [his] jurisdiction, Ralph Hall and Crystal Woods would review those complaints filed by African-Americans" (Dkt. No. 37, at 34).  Mr. Wilson alleges that Mr. Hall and Ms. Woods "interfered with the legal division [sic] handling of EEO claims filed by African-American employees" (*Id.*).  In his deposition, Mr. Wilson indicated that at some point in time the EEO Section "was removed from his jurisdiction" (Dkt. No. 37-1, at 19).  In his amended complaint, Mr. Wilson alleges that whenever African-American employees would file EEO complaints of discrimination, Mr. Hall, who in 2006, served as the Assistant to the Director for HTD, "would review these complaints and would often be dismissive of the claims, despite some of them having merit" (Dkt. No. 8, ¶ 37).  Mr. Wilson offers as an example an EEO complaint filed by Laura Carter, an African American employee who, Mr. Wilson states "was extremely qualified for the position that she applied for" (*Id.* at ¶ 38).  Mr. Wilson alleges that Mr. Hall and Ms. Woods did not promote Ms. Carter and instead awarded an open position to a white male employee.

Mr. Wilson also cites a discrimination claim asserted by Sarah Sanders, an African-American employee who claimed that HTD passed her over for a promotion.  Mr. Wilson states that Mr. Hall was involved in this matter.  Mr. Wilson states that he recommended that the department settle Ms. Carter and Ms. Sander's cases and that HTD award them a promotion.  Mr. Wilson alleges that his "recommendation angered Mr. Hall and other administrators" of HTD (Dkt. No. 8, ¶ 41).  HTD ultimately settled the cases with Ms. Carter and Ms. Sanders for $250,000.00.  Mr. Wilson also claims that he recommended HTD settle sexual-harassment claims brought by Allison Hodges and Ted English, two Caucasian employees.  HTD settled Ms. Hodges and Mr. English's claims for $400,000.00.

In his amended complaint, Mr. Wilson alleges that, in 2009, he "was supportive of a Supportive Services Contract being awarded to a Disadvantage [sic] Business Enterprise" (Dkt. No. 8, ¶ 42). Mr. Wilson claims that "Mr. Hall was not supportive of this contract being awarded to a minority contractor, and simply sat on the contract stalling the process" (*Id.*, ¶ 43). Mr. Wilson also claims that he spoke out against HTD's retaining a Caucasian male employee who had stolen items because HTD had previously terminated an African American employee for stealing. Mr. Wilson states that he "spoke out against this action, advising [HTD] that it was guilty of discriminatory practices" (*Id.*, ¶ 46).

Mr. Wilson filed his first EEOC charge of discrimination on August 16, 2011. This charge stated that "[i]n 2008, I backed up recommendations regarding EEO compliance. Since that time my work has been scrutinized more than similarly situated employees and I have had to endure three audits in October 2010" (Dkt. No. 25-11). Mr. Wilson filed his second charge of discrimination with the EEOC on December 19, 2011. In his second charge, Mr. Wilson stated that he filed his first charge in August 2011, and that "[a]t approximately the same time, I was suspended with pay. On November 30, 2011, my attorneys filed in court. On December 14, 2011, I was discharged. I have knowledge of White employees who have filed in court and were not discharged" (Dkt. No. 25-12). Mr. Wilson also states in this second charge that "[t]he Commissioner stated I was discharged for failing to cooperate in an investigation" (*Id.*).

Mr. Wilson asserts that defendants, in their individual and official capacities, terminated him because of his race and in retaliation for opposing unlawful discriminatory practices in violation of Title VII, the Fourteenth Amendment, and § 1983. Mr. Wilson's Amended Complaint also "ask[s] [the Court] to assume supplemental jurisdiction over the plaintiff's state law claim of breach of contract" (Dkt. No. 8, at 2).

## II.     Standard

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.  *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008).  "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law."  *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).  However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings.  *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984).

"'The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff.'"  *Smith v. Int'l Paper Co.*, 523 F.3d 845, 848 (8th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.  The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial.  *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.

## III.    Discussion

Defendants move to dismiss Mr. Wilson's Title VII claims against them in their individual capacities, arguing that defendants do not meet the definition of "employer" in Title

VII.  In their individual and official capacities, defendants move for summary judgment as to Mr. Wilson's racial discrimination and retaliation claims under Title VII, the Fourteenth Amendment, and § 1983.  In their individual capacities, defendants also assert the defense of qualified immunity.  Defendants move to dismiss Mr. Wilson's breach of contract claim, as well.

### A.      Title VII And Individual Capacities

The Eighth Circuit Court of Appeals has consistently held that "supervisors may not be held individually liable under Title VII."  *Griffin v. Webb*, 653 F. Supp. 2d 925, 933 (E.D. Ark. 2009) (quoting *Clegg v. Ark. Dep't of Corr.*, 496 F.3d 922, 931 (8th Cir. 2007) (quoting *Schoffstall v. Henderson*, 223 F.3d 818, 821 n.2 (8th Cir. 2000))).  Accordingly, the Court dismisses with prejudice Mr. Wilson's Title VII claims against all defendants in their individual capacities.

### B.      Claims Of Racial Discrimination

Mr. Wilson alleges that defendants suspended him with pay and then suspended him without pay before ultimately terminating him because he is an African American, all in violation of Title VII, the Fourteenth Amendment, and § 1983.  The elements of an equal protection claim alleging racial discrimination by an employer under 42 U.S.C. § 1983 are the same as those under Title VII.  *See Moody v. Vozel*, 771 F.3d 1093 (8th Cir. 2014).  A plaintiff in an employment discrimination case may survive a motion for summary judgment through "proof of 'direct evidence' of discrimination . . . .  [or] through the *McDonnell Douglas* analysis, including sufficient evidence of pretext."  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1044 (8th Cir. 2011); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Mr. Wilson does not offer direct evidence of discrimination.  Further, the Court does not view the alleged statement raised by defendants in their briefing and purportedly made by Commissioner Murphy,

18

that he did not like the EEO section at the HTD, as direct evidence of race discrimination (Dkt. No. 26, at 15).  Therefore, the Court will analyze Mr. Wilson's claim of discrimination under the *McDonnell Douglas* burden-shifting framework.

Under *McDonnell Douglas*, "a plaintiff first must establish a prima facie case of discrimination . . . ."  *Wilking v. County of Ramsey*, 153 F.3d 869, 872 (8th Cir. 1998).  To establish a *prima facie* case of discrimination under the Equal Protection Clause or Title VII, a plaintiff must show that (1) he is a member of a protected class; (2) he was meeting his employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) that similarly situated employees outside the protected class were treated differently or that there are facts permitting an inference of discrimination.  *Onyiah v. St. Cloud State Univ.*, 684 F.3d 711, 716 (8th Cir. 2012); *Canady v. Wal-Mart Stores, Inc.*, 440 F.3d 1031, 2034 (8th Cir. 2006).

Once a plaintiff has established a *prima facie* case of discrimination, the employer must articulate a legitimate, nondiscriminatory reason for its actions.  *Johnson v. Securitas Sec. Servs. USA, Inc.*, 769 F.3d 605, 611 (8th Cir. 2014).  If the employer carries its burden, the employee must then prove that the employer's articulated reason was merely pretext for discrimination.  *Id.* "To survive summary judgment, an employee must both discredit the employer's articulated reason and demonstrate the 'circumstances permit a reasonable inference of discriminatory animus.'"  *Id.* (quoting *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 855 (8th Cir. 2012)).

## 1.      The *Prima Facie* Case

In this case, defendants contend that Mr. Wilson cannot establish a *prima facie* case of discrimination because he cannot show that he met his employer's legitimate job expectations. "The standard for assessing performance 'is not that of the ideal employee, but rather what the employer could legitimately expect.'"  *Calder v. TCI Cablevision of Missouri, Inc.*, 298 F.3d

723, 729 (8th Cir. 2002) (quoting *Kethley v. Ameritech Corp.*, 187 F.3d 915, 920 (8th Cir.

1999)).   An employee fails this standard even if he "meets some expectations" but "does not

meet other significant expectations."   *Id.* (citing *Ziegler v. Beverly Enters.—Minnesota, Inc.*, 133

F.3d 671, 676 (8th Cir. 1998)).   Employers may legitimately expect that their employees will not

be insubordinate.   *See Miner v. Bi-State Dev. Agency*, 943 F.2d 912, 913 (8th Cir. 1991).

Defendants argue that they legitimately expected that Mr. Wilson would not be

insubordinate in the performance of his duties.   Specifically, defendants point to Mr. Wilson's

purported refusal to cooperate with the independent investigators from Williams & Anderson as

an example of Mr. Wilson not meeting defendants' legitimate expectations.   They also contend

that Mr. Wilson, as Chief Legal Counsel, was insubordinate when he did not follow instructions

from Commissioner Murphy and Director Bennett to assist and prepare them in their preparation

for testimony before the Legislative Joint Auditing Committee regarding employee timekeeping

issues.   Lastly, defendants argue that they had a right to terminate Mr. Wilson when the results of

Williams & Anderson's investigation and HTD's internal audit showed that Legal Division

employees were allowed to indicate on their timesheets that they were working when they were

not and that Mr. Wilson either directed or authorized the removal of the certification statement

from the Legal Division employees' timesheets.

In response, Mr. Wilson argues that he refused to participate in the Williams & Anderson

investigation because he had already given a statement to internal auditor Judy Robertson; he had

provided a memorandum to former HTD Director Dan Flowers on November 30, 2010; any

document or report created by Williams & Anderson would be a public document; and

defendants wanted him to make statements while criminal charges were being considered.   Mr.

Wilson contends that he did not cooperate with Williams & Anderson attorney Phil Kaplan

because Mr. Wilson was told that the investigation could lead to his arrest and because he requested, but was not provided, *Garrity* Warnings in accordance with *Garrity v. New Jersey*, 385 U.S. 493 (1967).  Mr. Wilson also states that the Legislative Joint Audit Report indicated that the information was being turned over to the prosecuting attorney for possible charges to be filed against him.  Mr. Wilson claims that he tried to explain his position before the Legislative Joint Auditing Committee, "which was a political lynching for the plaintiff" (Dkt. No. 36, ¶ 21).

This argument presents difficult issues.  In a line of cases decided between 1967 and 1977, the Supreme Court specifically defined the Fifth Amendment rights of public employees in the context of employer investigations.[1]  *See Lefkowitz v. Cunningham*, 431 U.S. 801, 809 (1977); *Lefkowitz v. Turley*, 414 U.S. 70, 84-85 (1973); *Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation*, 392 U.S. 280, 284-85 (1968); *Gardner v. Broderick*, 392 U.S. 273, 278-79 (1968); *Garrity*, 385 U.S. at 500.  When public employers seek to compel answers from employees by threatening their jobs or asking for waivers of their rights, employees have automatic immunity from the use of those answers in subsequent criminal prosecutions. *Cunningham*, 431 U.S. at 805-06.  Coercion is implicit in such threats.  *Garrity,* 385 U.S. at 497, 500 ("The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent."); *Gardner*, 392 U.S. at 278.  Public employers can compel statements from employees only when the employee has immunity and the questions are narrowly tailored to the employee's duties; immunity can be expressly granted or implied when questioning is coercive.  *Gardner*, 392 U.S. at 278.

---

[1]  Mr. Wilson's amended complaint does not appear to assert properly as a separate claim that defendants violated Mr. Wilson's *Garrity* rights under the Fifth Amendment.  Instead, Mr. Wilson argues in his filings that *Garrity* justifies his failure to cooperate with the Williams & Anderson investigation in response to defendants' argument that he was not meeting their legitimate job expectations.  For these reasons, the Court declines to reach the merits of any separate claim based on *Garrity* and the Fifth Amendment.

A public employee may assert the Fifth Amendment privilege against self-incrimination in an administrative investigation to protect against any disclosure the individual reasonably believes could be used in his own criminal prosecution or could lead to other evidence that might be used in such a prosecution. *Kastigar v. United States,* 406 U.S. 441, 444–45 (1972). Nevertheless, because an employee receives "use immunity" through the so-called *Garrity* exclusion rule, he may be removed for failure to cooperate with an agency investigation. *Gardner*, 392 U.S. at 276. "For these purposes, moreover, the state is treated as a unit. . . . Oddly, the cases do not bother to say this; but it is implicit in any case involving an employee of a department that does not do criminal prosecutions and it is his own department rather than the prosecutor that is interrogating him; and that of course is the standard case." *Atwell v. Lisle Park Dist.*, 286 F.3d 987, 990 (7th Cir. 2002) (citing *Gulden v. McCorkle*, 680 F.2d 1070, 1071 (5th Cir. 1982)).

*Garrity* and the cases that followed left unanswered whether public employers must warn employees that they must answer questions put to them by their employer when immunity is either expressly granted or attaches due to the coercive nature of the questioning.  There is a circuit split on the issue of whether warnings are required.  *See Atwell*, 286 F.3d at 990 (requiring warnings); *Modrowski v. Dep't of Veterans Affairs*, 252 F.3d 1344, 1351 (Fed. Cir. 2011) (requiring warnings); *Gulden*, 680 F.2d at 1071 (not requiring warnings); *Hester v. City of Milledgeville*, 777 F.2d 1492, 1496 (11th Cir. 1984) (not requiring warnings).

The Eighth Circuit Court of Appeals does not require an employer to provide warnings. *Hill v. Johnson*, 160 F.3d 469 (8th Cir. 1998).  Even in circuits that require an employer to provide warnings, employers may properly compel answers to pertinent questions about the performance of an employee's duties as long as that employee is duly advised of his options to

22

answer under any immunity actually granted or remain silent and face dismissal.  *Weston v. Dep't of Hous. & Urban Dev.,* 724 F.2d 943, 948 (Fed.Cir.1983).  Further, it is likely all courts would agree that "[t]he employee has no right to skip the interview merely because he has reason to think he'll be asked questions the answers to which might be incriminating.  He may be asked other questions as well."  *Atwell*, 286 F.3d at 991.  The Eighth Circuit has maintained that "[t]he Fifth Amendment is violated only by the combined risks of both compelling the employee to answer incriminating questions and compelling the employee to waive immunity from the use of those answers."  *Hill*, 160 F.3d at 471.

Given the record evidence, there appears to be ambiguity in Mr. Wilson's legal rights at various points.  In June 2011, the Legislative Joint Auditing Committee's Internal Control and Compliance Assessment of the leave practices of HTD's Legal Division and of Mr. Wilson's involvement stated that "[t]his matter will be referred to the Sixth Judicial District Prosecuting Attorney" (Dkt. No. 25-9, at 2).  Mr. Wilson states that, in or around August 2011, "[a]t the time of [his] attempted questioning by Williams and Anderson, when he met with Phil Kaplan, he was told that this investigation could lead to him being arrested" (Dkt. No. 37, at 23).  Mr. Wilson contends that he asked for *Garrity* Warnings during this meeting but was not provided any  (Dkt. No. 36, ¶ 18).  Mr. Wilson concedes that "defendants advised counsel for the plaintiff that the highway department was not prosecuting the plaintiff, and that it would only turn over any documents if subpoenaed to do so" (Dkt. No. 37, at 23).  In September 2011, Mr. Wilson contends he was required to appear before the Legislative Joint Auditing Committee, a meeting he describes as "nothing short of a political lynching" at which he believed he was being "thrown under the bus" by the HTD (Dkt. No. 37, at 10).  After this, in an October 21, 2011, letter to Mr. Wilson, Director Bennett stated that HTD had "indicated on several occasions that we do not

intend to turn over to the prosecutor any information that you may provide to Mr. Kaplan and/or Ms. Maxey" (Dkt. No. 37-3, at 27). Based on the record evidence, there is some ambiguity in the scope of any alleged immunity. *Cf. Kastigar,* 406 U.S. at 449 ("If, on the other hand, the immunity granted is not as comprehensive as the protection afforded by the [Fifth Amendment] privilege, petitioners were justified in refusing to answer.").

It remains controlling law, however, that "[a]s long as a public employer does not demand that the public employee relinquish the employee's constitutional immunity from prosecution, . . . the employee can be required to either testify about performance of official duties or to forfeit employment." *Hill*, 160 F.3d at 471. Moreover, even if the employee is "not expressly told that his answers [during an investigation] . . . could not be used against him in [a] criminal prosecution, the mere failure affirmatively to offer immunity is not an impermissible attempt to compel a waiver of immunity." *Id.* (citing *Harrison v. Wille*, 132 F.3d 679 (11th Cir. 1998); *Gulden*, 680 F.2d 1070)). As a public employee, Mr. Wilson "subject[s] [himself] to dismissal if [he] refuse[s] to account for [his] performance of the[] public trust, after proper proceedings, which do not involve an attempt to coerce [him] to relinquish [his] constitutional rights." *Uniformed Sanitation Men Ass'n*, 392 U.S. at 285.

The parties have devoted substantial briefing on *Garrity.* The parties present factual disputes and legal issues involving *Garrity*'s application in this case, some of which are potentially novel issues. Nonetheless, the Court concludes that it need not decide the *Garrity* issue to resolve defendants' motion for summary judgment or Mr. Wilson's claims.

The Court turns to the next argument. Mr. Wilson argues that he was never "directed" to meet with Commissioner Murphy and Director Bennett and that "there was no need to meet with Mr. Murphy or Mr. Bennett, because they would not have listened to Mr. Wilson's advice

anyway" (Dkt. No. 36, at ¶ 19).   Although Mr. Wilson claims that Commissioner Murphy and Director Bennett never "directed" him to attend a meeting with them, Mr. Wilson does not claim that he did not know about the meeting or that they did not request him to attend a meeting. Furthermore, although Mr. Wilson states that Commissioner Murphy and Director Bennett would not have listened to him at a meeting, Mr. Wilson provides no record evidence supporting this allegation.   Mr. Wilson has not argued that defendants' expectation that he would attend a meeting with Commissioner Murphy and Director Bennett is illegitimate or unrelated to his role and responsibilities as Chief Legal Counsel for HTD and the Commission.

In regard to the third point raised by defendants, defendants claim they had a right to terminate Mr. Wilson when the results of Williams & Anderson's investigation and HTD's internal audit showed that Legal Division employees were allowed to indicate on their timesheets that they were working when they were not and that Mr. Wilson either directed or authorized the removal of the certification statement from the Legal Division employees' timesheets.   In November 2010, HTD's internal audit of the Legal Division indicated that Mr. Wilson began directing employees to delete certification statements in September 2007.   Although Mr. Wilson contests this fact, he provides no other record evidence to support his position.   He denies any involvement in employees' deleting or removing certification statements.   (Dkt. No. 36, ¶ 15).

Regardless of the points raised by defendants and Mr. Wilson, at this stage, the Court need not decide whether Mr. Wilson met defendants' legitimate job expectations because, assuming *arguendo* that Mr. Wilson has demonstrated a *prima facie* case of discrimination under the *McDonnell Douglas* framework, his claims of race discrimination fail because he cannot establish that defendants' proffered reasons for terminating him are a pretext for discrimination.

### 2.        The Proffered Reason for Termination

Defendants have the burden to articulate a legitimate, nondiscriminatory reason for their employment actions against Mr. Wilson.  "This burden is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (internal quotes omitted).  At this stage and under *McDonnell Douglas*, the Court gives deference to an employer's stated reason for an adverse employment action.  *See Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 257-58 (1981).  Defendants state that they suspended and ultimately terminated Mr. Wilson "because of, among other reasons, the misconduct [he] engaged in as detailed in the legislative audit and in the report of Williams and Anderson, coupled with [his] failure to cooperation [sic] in the ongoing investigation" (Dkt. No. 37-4, at 1).  Defendants state that the legislative audit and the report of Williams & Anderson show that Mr. Wilson directed or authorized the deletion of the Certification Statements from the Legal Division employees' timesheets and allowed Legal Division employees to code the paid time off as if the employees were working.  Accordingly, defendants have met their burden of production to articulate a legitimate, nondiscriminatory reason for suspending and terminating Mr. Wilson.

### 3.        Analysis of Claimed Pretext

Mr. Wilson has the burden to prove that these reasons were "not [the] true reasons, but were pretext for discrimination." *Tex. Dep't of Comm. Affairs v. Burden*, 450 U.S. 248, 253 (1981).  "To prove pretext, a plaintiff must both discredit an employer's asserted reason for termination and show that the circumstances permit drawing the reasonable inference that the real reason for terminating the plaintiff was [his] race." *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 935 (8th Cir. 2006).  Proving pretext "requires more substantial evidence than is required to

26

make a prima facie case because evidence of pretext is viewed in light of [the employer's] proffered justification." *Fieror v. CSG Systems, Inc.*, 759 F.3d 874, 878 (8th Cir. 2014). "'Our precedent establishes that the critical inquiry in discrimination cases like this one is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge.'" *Johnson*, 769 F.3d at 612 (quoting *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1002 (8th Cir.2012)).

Mr. Wilson argues that defendants' reasons for terminating him were pretext because defendants treated similarly situated employees differently than they treated him. "At the pretext stage, the test for whether someone is sufficiently similarly situated, as to be of use for comparison, is rigorous." *Id.* at 613 (citing *Bone v. G4S Youth Servs., LLC,* 686 F.3d 948, 956 (8th Cir.2012)). The plaintiff employee "must show that [he] and the employees outside of [his] protected group were similarly situated in all relevant respects." *Id.* (internal quotes omitted). "[I]ndividuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Id.* (quoting *Bone*, 686 F.3d at 956); *see also Clark v. Runyon,* 218 F.3d 915, 918 (8th Cir.2000)).

Even if this Court puts aside and does not consider whether Mr. Wilson was justified in failing to participate in Williams & Anderson's investigation, the individuals whom Mr. Wilson identifies are not proper comparators. Mr. Wilson contends that "Caucasian division heads were in fact doing the same thing that Mr. Wilson was doing" (Dkt. No. 37, at 24).

Mr. Wilson first points to Ms. Woods, a Caucasian who is the Division Head of Human Resources for HTD. Ms. Woods is responsible for the personnel manual and the reviewing of

hiring, firing, and demotion decisions made within HTD.  Ms. Woods played some type of trivia game on days preceding a holiday, and if an employee answered a question correctly, Ms. Woods rewarded that employee with two to four hours off from work.   Ms. Woods coded her employees' leave time as "admin leave."  In her deposition, Ms. Woods stated that she did not know if an auditor expressed concern over her practices or if it was Mr. Hall, the person who contacted the fraud hotline and reported Mr. Wilson's leave practices to Ms. Robertson, who expressed concern to her.  Mr. Wilson states that Ms. Woods discussed her leave practices with Mr. Hall during the summer of 2010, when the internal audit about Mr. Wilson's practices was released (Dkt. No. 36, ¶ 24).  Mr. Wilson states that although Mr. Hall informed Ms. Robertson about Mr. Wilson's practice of allowing employees to take time off that had not been earned, Mr. Hall did not tell Ms. Robertson about Ms. Woods's practices (*Id*).  Ms. Robertson states that she learned about Ms. Woods's practices sometime after Mr. Wilson was terminated from HTD.  Ms. Woods discontinued her practice of allowing employees to take time off as a reward for correctly answering questions in the game sometime after learning about the investigation of Mr. Wilson.  Ms. Robertson did not conduct an investigation of Ms. Woods's practices.

The Court finds that Ms. Woods is not similarly situated to Mr. Wilson.  Unlike the allegations against Mr. Wilson, there are no allegations that Ms. Woods failed to attend meetings pertinent to her responsibilities or that she removed or directed the removal of a certification statement from her employees' timesheets.  Although Mr. Wilson denies that he directed the removal of such certification statements, the Court's analysis "is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge.'"  *Johnson.*, 769 F.3d at 612 (holding that employer's reliance on "internal documents" to determine if employee

violated policy showed employer's good faith belief that employee violated the policy); *see also Johnson v. AT&T Corp.*, 422 F.3d 756, 762 (8th Cir. 2005) (holding that an employer did not have to be correct in its determination that an employee made bomb threats but only had to honestly believe that the employee made the threats).

In terminating Mr. Wilson, defendants relied in part on the report prepared by Williams & Anderson. This report quotes statements and emails from Legal Division employees indicating that Mr. Wilson directed employees to sign their time sheets without the certification statement (Dkt. No. 25-19, at 11). The Court finds that defendants' reliance on this report indicates that defendants honestly believed that Mr. Wilson directed the removal of the certification statements from the Legal Division employees' time sheets. Mr. Wilson argues that "what [he] was doing, he had been instructed by Dan Flowers and Jane Wilson to do" (Dkt. No. 36, ¶ 23). Yet, as support, Mr. Wilson points only to former Director Flowers's deposition. Although Director Flowers confirms that he told Mr. Wilson to let employees off for some amount of time to compensate them for time that they worked over and above normal hours, nothing in the record before the Court shows that Director Flowers knew about or directed Mr. Wilson's deletion of the certification statements.

Furthermore, Mr. Wilson does not dispute defendants' argument that Ms. Woods did not have the same immediate supervisor as Mr. Wilson and therefore is not similarly situated to Mr. Wilson. Mr. Wilson has made no effort to distinguish his case from *Bone v. G4S Youth Services*, 686 F.3d 948, 956 (8th Cir. 2012). In *Bone*, the Eighth Circuit held that the plaintiff's proffered comparators were not similarly situated to the plaintiff because the plaintiff's supervisor "was not the direct supervisor" for the proffered comparators. 686 F.3d at 956. The plaintiff's supervisor in *Bone* "merely approved [the comparators'] terminations," but other "supervisors

handled [the comparators'] progressive discipline and ultimately recommended their dismissals."
*Id.* Here, Mr. Wilson has attached as an exhibit to his statement of facts a chart of HTD's organization (Dkt. No. 36-3, at 8). This chart indicates that the Human Resources Department reports to the Assistant to the Director. The Chief Counsel, on the other hand, reports directly to the Highway Commission and the Director of HTD. Therefore, the record indicates that Mr. Wilson and Ms. Woods do not have the same direct supervisor. Accordingly, because Ms. Woods's conduct is distinguishable from Mr. Wilson's and because they have different direct supervisors, Ms. Woods is not similarly situated to Mr. Wilson in all relevant respects.

Mr. Wilson next points to testimony from Mr. English, who states that he was aware of other division heads who allowed their employees to take time off. Mr. English states that, in the Traffic Safety Division, which later became the Planning and Research Division, John Waldrip, the section head; Mike Selig, the assistant division head; and Alan Meadors, the division head, allowed employees to take time off. Mr. Waldrip, Mr. Selig, and Mr. Meadors are all Caucasian. Mr. English also states that, while all three allowed employees to take time off, Mr. Waldrip and Mr. Meadors also allowed employees to turn in two separate time sheets, one reflecting the official time turned into payroll and the other reflecting the unofficial time turned into the division and section heads.

The Court finds that Mr. Waldrip, Mr. Selig, and Mr. Meadors are not similarly situated to Mr. Wilson. Again, the HTD organizational chart provided by Mr. Wilson indicates that the Planning and Research Division reports directly to the Deputy Director and the Chief Engineer, not the Director of HTD (Dkt. No. 36-3, at 6). Moreover, Mr. Wilson has provided no evidence that Director Bennett or any Commissioner knew of the alleged fraud conducted by Mr. Waldrip and Mr. Meadors. Further, Mr. Wilson has not argued that Mr. Waldrip, Mr. Selig, or Mr.

Meadors failed to attend meetings or to fulfill their responsibilities in a way comparable to Mr. Wilson's failure to meet with Commissioner Murphy and Director Bennett. Therefore, Mr. Waldrip, Mr. Selig, and Mr. Meadors are not similarly situated to Mr. Wilson.

Lastly, Mr. Wilson argues that defendants' stated reasons for his termination were pretext because Mr. Flowers, the previous Director of HTD approved his leave plan, because Director Bennett knew about the leave practices as early as 2000, and because defendants' response to Mr. Wilson's first set of interrogatories and requests for production of documents indicated that they were aware of the leave practice as early as 2007. Defendants maintain that they did not have knowledge that the time off was recorded as time worked or that the certification statements had been deleted from the timesheets. Mr. Wilson has provided no evidence that defendants did in fact have such knowledge of how the time was recorded or of the removed certification statements prior to the investigations of Mr. Wilson's conduct. For these reasons, the Court concludes that Mr. Wilson's record evidence is insufficient to establish that he was directed to implement his leave policy or remove the certification statements and insufficient to prove that defendants' stated reasons for terminating him were pretext for discrimination.

Accordingly, Mr. Wilson has failed to prove that defendants' proffered reasons for suspending and terminating him were a pretext for discrimination. The Court grants defendants' motion for summary judgment over Mr. Wilson's claims of racial discrimination for his suspensions and termination from HTD.

### C.     Claims Of Retaliation

Mr. Wilson "alleges that due to his advocacy on behalf of African-American employees, who were discriminated against by the department, he soon became a target of retaliatory conduct" (Dkt. No. 37, at 33). Mr. Wilson brings his retaliation claims under Title VII, the

Fourteenth Amendment, and § 1983.   There is no clearly established right under the Equal Protection Clause of the Fourteenth Amendment to be free from retaliation. *Burton v. Arkansas Secretary of State* 737 F.3d 1219, 1237 (8th Cir. 2013).   Such a right exists under the First Amendment. *Id.*  Mr. Wilson does not reference the First Amendment in his operative complaint (Dkt. No. 8).

Regardless, courts apply the same analytical framework to retaliation claims brought under Title VII and § 1983. *See Hill v. City of Pine Bluff, Ark.*, 696 F.3d 709, 716 (8th Cir. 2012).   At base, these laws prohibit an employer from discriminating against an employee or applicant for employment "because he has made a charge" of discrimination against the employer.  42 U.S.C. § 2000e-3(a); *Tyler v. Univ. of Ark. Bd. of Trustees*, 628 F.3d 980, 985 (8th Cir. 2011).  The *McDonnell Douglas* analytical framework applies to retaliation claims. *Tyler*, 628 F.3d at 985.  To show a *prima facie* case of retaliation, a plaintiff generally must show that "'(1) the plaintiff engaged in protected conduct, including opposition to an action prohibited by [antidiscrimination laws]; (2) [he] was subjected to an adverse employment action[;] and (3) there is a causal nexus between the protected conduct and the adverse action.'" *Id.* (quoting *Lewis v. Heartland Inns of Am., LLC*, 591 F.3d 1033, 1042 (8th Cir.2010)).   In Title VII retaliation cases, the plaintiff must prove that her protected activity was the "but-for" cause of the challenged employment action. *Musolf v. J.C. Penney Co.*, 773 F.3d 916, 918-19 (8th Cir. 2014).   If a plaintiff makes a *prima facie* case, the burden shifts to the employer "to articulate a legitimate, non-retaliatory reason for the adverse action." *Id.*  Once the employer meets its burden, the plaintiff has the burden to show that the employer's articulated reason was pretext for retaliation. *See Guimaraes v. SuperValu, Inc.*, 674 F.3d 96, 977-78 (8th Cir. 2012); *Wireman v. Casey's General Stores*, 638 F.3d 984, 1001 (8th Cir. 2011).

32

Mr. Wilson claims that Mr. Hall and Ms. Woods interfered with the Legal Division's handling of EEO claims filed by African-American employees.  Mr. Wilson alleges that his recommendations regarding several employment discrimination claims angered Mr. Hall and other administrators of HTD.  Specifically, Mr. Wilson points to his recommendation regarding the discrimination claims filed by African-American employees Laura Carter and Sarah Sanders, which HTD ultimately settled.  Mr. Wilson also cites his recommendation to settle sexual-harassment claims brought by Allison Hodges and Ted English, which, again, HTD ultimately settled.  In his amended complaint, Mr. Wilson cites his support in 2009 of awarding a contract to a minority contractor and his opposition to retaining a Caucasian male who had apparently stolen items from HTD.  Mr. Wilson does not mention these latter two claims in his response to defendants' motion for summary judgment.  Lastly, Mr. Wilson alleges that he was suspended and ultimately terminated in part because he filed his charges of discrimination against HTD.

Defendants argue that Mr. Wilson has failed to establish a causal connection between these activities and his suspensions and termination.  It is unclear to the Court when the instances involving Ms. Carter, Ms. Sanders, Ms. Hodges, Mr. English, and the employee who stole items occurred.  Mr. Wilson's first EEOC charge alluded to him backing up recommendations to HTD's EEO compliance division in 2008.  Defendants assert that the "alleged activity from 2008 is time-barred," (Dkt. No. 26, at 27).  Mr. Wilson does not address this argument in his response to defendants' motion for summary judgment, nor does he indicate the specific dates of these incidents or when he made recommendations regarding these incidents.

Mr. Wilson does not appear to argue that the temporal proximity of his support of others' discrimination claims alone establishes a *prima facie* case of retaliation.  Even if he did, "generally more than a temporal connection is required to present a genuine factual issue on

retaliation." *Smith v. Fairview Ridges Hosp.*, 625 F.3d 1076, 1087-88 (8th Cir. 2010) (internal quotes omitted), *abrogated on other grounds by*, *Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011). "'The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close.'" *Id.* (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). The Eighth Circuit has held that a "matter of weeks" may be close enough to support a *prima facie* case while a two-month interval is insufficient by itself to establish a *prima facie case*. *Id.*

In this case, there is no evidence that Mr. Wilson's recommendations regarding other employees' discrimination claims occurred later than 2009, much less within a matter of weeks of either his suspensions or termination from HTD. Mr. Wilson offers no other evidence in support of his retaliation claim based on his recommendations regarding other employees' discrimination claims. Mr. Wilson merely offers his deposition testimony in which he repeats his allegations that Mr. Hall and Ms. Woods disagreed with his recommendations regarding various EEO complaints. The record facts establish, and Mr. Wilson does not dispute, that neither Mr. Hall nor Ms. Woods was involved in the decision to suspend or terminate Mr. Wilson. Moreover, Mr. Wilson has neither alleged nor presented any evidence that Director Bennett, who recommended Mr. Wilson's termination, or the Commission, who voted unanimously to terminate Mr. Wilson, maintained any retaliatory intent against Mr. Wilson for his recommendations related to Ms. Carter, Ms. Sanders, Ms. Hodges, Mr. English, the minority-owned contractor, or the employee who allegedly stole items from HTD. Therefore, Mr. Wilson has presented no evidence that his recommendations in these incidents were the but-for cause, or

even a motivating factor, of his suspensions or termination.  Mr. Wilson has failed to show a *prima facie* case of retaliation regarding these incidents.

Mr. Wilson also claims that defendants retaliated against him for filing his own EEOC charges of discrimination.  Mr. Wilson filed his first charge of discrimination with the EEOC on August 16, 2011.  Director Bennett placed Mr. Wilson on leave with pay on September 9, 2011, and then placed him on leave without pay on October 21, 2011.  Mr. Wilson filed his complaint in this Court on November 30, 2011.  Director Bennett recommended that the Commission terminate Mr. Wilson, and the Commission unanimously voted to terminate him on December 15, 2011.  Mr. Wilson filed his second EEOC charge of discrimination on December 19, 2011.

The Court will assume without deciding that Mr. Wilson has made a *prima facie* case of retaliation based on his claim that defendants retaliated against him because of his filing charges of discrimination against HTD with the EEOC.  Nonetheless, Mr. Wilson's retaliation claims fail because he has not provided sufficient evidence to show that defendants' proffered reasons for terminating him were pretext for discrimination.  Defendants again state that they suspended and eventually terminated Mr. Wilson, among other reasons, because Mr. Wilson failed to meet with and prepare Commissioner Murphy and Director Bennett on September 7, 2011, for testimony before the Joint Legislative Auditing Committee on September 9, 2011 (Dkt. Nos. 25-10, at 3; 26, at 27).  Furthermore, defendants state that they took these adverse actions against Mr. Wilson because of the findings of the Williams & Anderson investigation and the Joint Legislative Auditing Committee.  Defendants also cite as a reason Mr. Wilson's alleged failure to assist in the independent investigation conducted by Williams & Anderson and his failure to meet with Mr. Kaplan or Ms. Maxey before November 30, 2011.  For reasons explained above, the Court attributes no weight in this analysis to the meetings, or lack thereof, with Williams & Anderson.

35

Mr. Wilson has made no argument to the Court that defendants' stated reasons for suspending and terminating him were pretext for retaliation, other than to highlight to the Court the dates on which Mr. Wilson filed his EEOC charges and HTD took its actions against Mr. Wilson.  The Court construes Mr. Wilson's notation of these times as arguing that the temporal proximity of his filing the EEOC charges and HTD's adverse employment actions sufficiently undermine HTD's articulated reasons for suspending and terminating Mr. Wilson.  Nonetheless, the Court rejects this argument.

Even if such temporal proximity were enough to establish a *prima facie* case of retaliation, temporal proximity is undermined when the allegedly retaliatory motive coincides temporally with the non-retaliatory motive of the employer.  *Wierman*, 638 F.3d at 1001. Defendants' stated non-retaliatory motives for suspending and terminating Mr. Wilson also occurred before or within close proximity to the adverse employment actions.  The Legislative Joint Auditing Committee published its report concerning the HTD regarding the Legal Division and Mr. Wilson on June 8, 2011 (Dkt. No. 25-9).  Williams & Anderson submitted its report to Director Bennett and HTD on August 26, 2011 (Dkt. No. 25-19, at 1).  Defendants state that Mr. Wilson did not meet with Commissioner Murphy and Director Bennett on September 7, 2011. Director Bennett first suspended Mr. Wilson with pay on September 9, 2011, which is the same date that HTD and Mr. Wilson presented testimony before the Legislative Joint Auditing Committee   Further, Director Bennett provides an affidavit in which he maintains that he instructed Mr. Wilson again to meet with Commissioner Murphy and him on October 18, 2011, and that Mr. Wilson agreed to attend the meeting but failed to show up for the meeting.  Director Bennett suspended Mr. Wilson without pay on October 21, 2011.  Mr. Wilson filed suit on November 30, 2011.  Director Bennett sent to Mr. Wilson a series of letters from October 21,

36

2011, to the final letter dated December 15, 2011, detailing the alleged performance deficiencies. In his December 15, 2011, letter to Mr. Wilson, Director Bennett informed Mr. Wilson of the Commission's vote to terminate Mr. Wilson because of his failure to meet with the Williams & Anderson attorneys prior to November 30, 2011, his failure to otherwise cooperate in the investigation, and because of the "misconduct [he] engaged in as detailed in the legislative audit and the report of Williams and Anderson" (Dkt. NO. 37-4, at 1).  Mr. Wilson was terminated December 15, 2011.

Mr. Wilson has not disputed the dates of these events.  Accordingly, this Court concludes that Mr. Wilson's sole reliance on the temporal proximity of his charges of discrimination and the defendants' adverse employment actions against him are insufficient to show pretext.  Mr. Wilson has provided no other evidence of retaliatory intent by defendants or evidence sufficient to create a genuine issue of material fact regarding defendants' intent.  Therefore, the Court grants defendants' motion for summary judgment as to Mr. Wilson's claims that defendants retaliated against him because of his filing charges of discrimination.

### D.    Qualified Immunity

In their individual capacities, defendants raise the defense of qualified immunity to Mr. Wilson's claims of race discrimination and retaliation under the Fourteenth Amendment and § 1983.  For the same reasons the Court grants defendants' motion for summary judgment as to Mr. Wilson's claims of race discrimination and retaliation against defendants in their official capacities, the Court also grants summary judgment in favor of defendants in their individual capacities and need not address qualified immunity.

### E.      Breach Of Contract

In his amended complaint, Mr. Wilson asks this Court to assume supplemental jurisdiction over his state law claim for breach of contract.  Defendants argue in their motion for summary judgment that Mr. Wilson's amended complaint contains no allegations to support such a claim and, therefore, the Court must dismiss this claim.   Mr. Wilson does not address defendants' argument over his breach of contract claim in his response to defendants' motion for summary judgment. Accordingly, the Court grants defendants' motion as to Mr. Wilson's breach of contract claim.  The Court dismisses without prejudice this claim.

### IV.     Conclusion

For the foregoing reasons, the Court grants defendants' motion for summary judgment (Dkt. No. 25) as to Mr. Wilson's claims of race discrimination and retaliation under Title VII, the Fourteenth Amendment, and § 1983.  Accordingly, the Court also grants summary judgment in favor of defendants as to Mr. Wilson's claim for declaratory judgment under 28 U.S.C. § 2201. The Court dismisses without prejudice Mr. Wilson's breach of contract claim.

SO ORDERED this 9th day of February, 2015.

_____
KRISTINE G. BAKER
UNITED STATES DISTRICT JUDGE